FILED

NOT FOR PUBLICATION

DEC 10 2014

SUSAN M. SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

# UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE NINTH CIRCUIT

| | | |
|---|---|---|
| In re: | ) | BAP No.   AZ-13-1445-DJuKi |
| | ) | |
| SHANE JAY SKINNER and | ) | Bk. No.   12-02466 |
| JEANAMERRI N. SKINNER, | ) | |
| | ) | Adv. No. 12-00955 |
| Debtors. | ) | |
| _____ | ) | |
| | ) | |
| SHANE JAY SKINNER; | ) | |
| JEANAMERRI N. SKINNER, | ) | |
| | ) | |
| Appellants, | ) | |
| | ) | |
| v. | ) | **M E M O R A N D U M**[1] |
| | ) | |
| ANTHONY R. HUGGINS; | ) | |
| CATHERINE J. HUGGINS, | ) | |
| | ) | |
| Appellees. | ) | |
| _____ | ) | |

Argued and Submitted on November 20, 2014
at Phoenix, Arizona

Filed - December 10, 2014

Appeal from the United States Bankruptcy Court
for the District of Arizona

Honorable Brenda Moody Whinery, Bankruptcy Judge, Presiding[2]

Appearances:     Jill Holt Perrella of Snell & Wilmer LLP argued
for Appellants; Michael J. Vingelli of Law Offices
of Vingelli & Errico argued for Appellees.

---

[1] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8013-1.

[2] The subject adversary proceeding trial was conducted before Judge James M. Marlar.  His successor, Judge Whinery, ultimately denied the appellants' Second Renewed Motion for New Trial.

Before: DUNN, JURY AND KIRSCHER, Bankruptcy Judges.

This appeal arises from a handshake deal between the debtor, Shane Skinner, and Anthony Huggins, whereby Mr. and Mrs. Skinner (collectively, "Skinners") sold a classic car to Mr. Huggins. At the time of the deal, Desert Energy Credit Union ("DECU") held a lien against the car, a 1932 Ford Highboy Roadster ("Roadster"). DECU also held title to the Roadster.[3]

As part of the deal, the Skinners agreed to pay off DECU's lien so that clear title could pass to Mr. Huggins. When the Skinners defaulted on payments to DECU, it repossessed the Roadster.

When the Skinners filed for chapter 7 bankruptcy relief, Mr. Huggins and his wife, Catherine Huggins (collectively, "Huggins"), sought to except the debt owed to them by the Skinners from discharge in an adversary proceeding under § 523(a)(2)(A).[4] Following a two-day trial, the bankruptcy court found in favor of the Huggins, entering a judgment against the Skinners.

On appeal, the Skinners contend that the bankruptcy court erred in finding that they had intended to defraud Mr. Huggins at the time of the deal. For the reasons set forth below, we AFFIRM.

---

[3] In its memorandum decision, the bankruptcy court found that, as there was a lien on the Roadster, the Skinners retained title.

[4] Unless otherwise indicated, all chapter and section references are to the federal Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

**FACTS**[5]

On April 8, 2008, Mr. Skinner and Mr. Huggins[6] made a deal whereby the Skinners agreed to sell the Roadster[7] to Mr. Huggins in exchange for a payment of $12,000 cash ("cash payment") and the transfer of two unimproved lots located in Show Low, Arizona ("lots").[8]

At the time of the deal, DECU held a $33,000 lien against the Roadster. It also held the title to the Roadster. As part of the deal, the Skinners agreed to pay off DECU's lien on the Roadster so that clear title could pass to Mr. Huggins. When they entered into the deal with Mr. Huggins, the Skinners were late in their payments to DECU. They did not have sufficient funds to pay off DECU's lien on the Roadster.

Mr. Huggins and the Skinners did not execute a formal

---

[5] We have taken many of the facts from the joint pretrial statement entered on November 27, 2012, and from the bankruptcy court's memorandum decision entered on December 14, 2012.

[6] Mr. Huggins was a family friend; he had known Mr. Skinner's father.

[7] Aside from their testimony, neither Mr. Skinner nor Mr. Huggins presented any other evidence as to the value of the Roadster. At the trial, Mr. Skinner testified that the Roadster had a value of $65,000.
Mr. Huggins testified that the Roadster had a value "anywhere from $30,000 up." Tr. of Dec. 4, 2012 trial, 108:23. He elaborated that the Roadster's value was "whatever somebody want[ed] to pay for it." Tr. of Dec. 4, 2012 trial, 108:25. Mr. Huggins acknowledged that Mr. Skinner's valuation of the Roadster could be plausible.

[8] At the trial, Mr. Huggins testified that each lot had a value of $15,000.

3

agreement to memorialize the deal. Mr. Skinner instead presented Mr. Huggins a receipt, dated April 8, 2008. The receipt noted that Mr. Skinner received $12,000 cash and the lots from Mr. Huggins. It further noted that "Shane Pay Car off Period."

Mr. Huggins took immediate possession of the Roadster. Two days later, on April 10, 2008, he transferred the lots to Mr. Skinner by quit claim deed.

The Skinners did not apply any of the $12,000 cash payment toward the debt they owed DECU on the Roadster. Instead, they used the funds to pay bills and living expenses.

Over time, the Skinners continued to struggle with making their payments to DECU. They made sporadic payments to DECU on April 9, 2008, May 23, 2008, and June 17, 2008.

Notably, the Skinners not only owed debt to DECU on the Roadster, but they also owed debts to DECU on a 2006 BMW X5 ("BMW") and a 2005 Hummer H2 ("Hummer"). To consolidate their debts on the BMW, the Hummer and the Roadster (collectively, "Vehicles"), the Skinners entered into a refinance agreement with DECU on June 17, 2008. Specifically, they sold the BMW and the Hummer to a third party and added the negative equity from the BMW and the Hummer to the debt owed on the Roadster.[9] As a result, the debt owed by the Skinners on the Roadster increased to $60,000 approximately, within three months after the Roadster

---

[9] Mr. Skinner testified that he and Mrs. Skinner entered into two refinance agreements with DECU. In the first refinance, DECU agreed to lower the Skinners' payments on the Vehicles.
Despite refinancing the Vehicles, the Skinners still struggled to make the payments. The Skinners therefore sought to enter into a second refinance agreement with DECU.

4

deal with the Huggins was consummated.

In the meantime, the Skinners sold the lots to Sean Bowman for a total of $20,000 ("lot sale proceeds").[10]

---

[10] Mr. Bowman is a real estate investor in Tucson, Arizona; he has purchased and sold commercial and residential real property in the area for more than 30 years. According to Mr. Bowman and Mr. Skinner, Mr. Skinner approached him for a loan, which was to be secured by the lots. Both Mr. Skinner and Mr. Bowman understood the transaction concerning the lots to be a loan, not a sale.

Mr. Skinner had valued the lots at $30,000 each. But after performing his own research, Mr. Bowman determined the value of the lots to be $20,000 each. He informed Mr. Skinner that he would loan Mr. Skinner $20,000 only. Mr. Skinner accepted the loan amount.

The bankruptcy court did not characterize the transaction between Mr. Bowman and Mr. Skinner as a loan. It believed that "if they intended it as a loan, that's not what they wrote. It's an outright sale with an option." Tr. of Dec. 11, 2012 trial, 12:2-3.

The bankruptcy court did not clearly err in finding that the transaction between Mr. Bowman and Mr. Skinner was not a loan but a sale. If the transaction truly had been a loan secured by the lots, Mr. Bowman would have a deed of trust documenting his security interest. Instead, Mr. Bowman received a warranty deed. The warranty deed explicitly stated that the Skinners conveyed the lots to Mr. Bowman.

Moreover, Mr. Bowman and Mr. Skinner executed an option agreement whereby Mr. Skinner had the option to repurchase the lots upon certain terms and conditions. He further had to pay Mr. Bowman a monthly option fee of $125 per lot.

The option agreement specifically stated that Mr. Bowman "is the owner of [the lots] . . ., which [were] purchased from [Mr.] Skinner." It further provided that

Sean Bowman hereby grants to Shane Skinner an option to purchase the [lots] pursuant to the terms and conditions contained herein (the 'Option'), and Shane Skinner hereby agrees to accept such Option to purchase the [lots] from Sean Bowman.

(continued...)

5

They transferred the lots to Mr. Bowman by warranty deed on May 23, 2008, less than two months after the Skinners' sale of the Roadster to the Huggins. The Skinners used a portion of the lot sale proceeds to facilitate the refinance transaction involving the Roadster, the BMW and the Hummer with DECU.

The Skinners had difficulties making payments to DECU under the refinance. They managed to make two payments only: one on August 21, 2008, and the other on January 9, 2009. Unsurprisingly, the Skinners were "not in a position to pay off the $60,000 [lien]." Tr. of Dec. 4, 2012 trial, 24:24-25, 25:1.

When the Skinners defaulted on their payments to DECU, it initiated a state court action against the Skinners and the Huggins. Upon repossessing the Roadster from Mr. Huggins, DECU dismissed its claim(s) against the Huggins. DECU obtained a judgment against the Skinners.

The Skinners filed their chapter 7 bankruptcy petition on February 10, 2012. The Huggins subsequently filed a § 523(a)(2)(A) complaint against the Skinners. The Huggins alleged that, at the time of the sale of the Roadster, Mr. Skinner falsely represented that he would use the cash payment and the lot sale proceeds to pay off DECU's lien so that clear title would pass to Mr. Huggins.[11] They further alleged

---

[10] (...continued)

Ultimately, Mr. Skinner stopped paying the option fees. He never exercised the option to repurchase the lots from Mr. Bowman.

[11] Prepetition, the Huggins initiated a state court action
(continued...)

that, at the time of the deal, Mr. Skinner intended to deceive Mr. Huggins when he made this false representation.

In their answer, the Skinners admitted that they agreed to pay off DECU's lien on the Roadster so that clear title could pass to Mr. Huggins. They also admitted that they received from Mr. Huggins the cash payment and the quit claim deeds to the lots. The Skinners further admitted that they sold the lots.

But the Skinners denied that they failed to apply any of the cash payment and the lot sale proceeds to the debt owed on the Roadster. They further denied that Mr. Skinner intended to deceive Mr. Huggins at the time of the deal.

The bankruptcy court held a two-day trial.[12] On the first

---

[11](...continued)
against the Skinners for breach of contract and breach of duty of good faith and fair dealing. The Skinners neither answered nor appeared in the state court action. The state court entered a default judgment against the Skinners in the total amount of $62,278 ($62,000 award plus $278 costs) plus 10% interest per annum.

The bankruptcy court determined that the state court default judgment did not have any preclusive effect because the state court did not consider any evidence "that everyone had an opportunity to deal with." Tr. of Dec. 4, 2012 trial, 99:20-21. It also determined that the state court default judgment did not have evidentiary value.

[12] Before the trial, the Skinners moved for summary judgment on the grounds that: 1) the Huggins failed to allege facts showing that Mr. Skinner falsely promised to pay off DECU's lien at the time he and Mr. Huggins entered the deal, and 2) the Huggins could not pursue a claim for fraud against the Skinners after they obtained a default judgment in state court on their claim for breach of contract on the same facts – i.e., the state court judgment had preclusive effect. The Huggins filed a cross-motion for summary judgment.

(continued...)

7

day of trial, Mr. Skinner and Mr. Huggins testified as to their respective understandings of the deal.[13] They particularly focused on: 1) whether the deal required Mr. Skinner to apply the cash payment and the lot sale proceeds to the debt he owed to DECU on the Roadster; and 2) whether the Skinners intended to pay off DECU's lien at the time they entered the deal with Mr. Huggins.

Mr. Skinner maintained that he did make some payments on the Roadster while Mr. Huggins had possession of it. He made payments on the Roadster on April 9, 2008, and May 23, 2008.[14] He also made a payment on June 17, 2008. However, Mr. Skinner could not recall whether he made any payments to DECU following the refinance.

Mr. Skinner testified that when he wrote "Shane Pay off Car

---

[12](...continued)
The bankruptcy court held a hearing on the Skinners' motion for summary judgment on November 7, 2012. The bankruptcy court did not expressly deny their motion for summary judgment. According to the minute entry for the hearing, it simply stated that "[t]his case will have to be tried." Adv. Proc. Docket No. 23. The bankruptcy court did not enter a formal order on either the Skinners' motion for summary judgment or the Huggins' cross-motion for summary judgment.

[13] Mrs. Skinner also provided testimony at trial. Her testimony was limited to: 1) the Skinners' difficulty in making their payments to DECU on the Vehicles; 2) the dates of the Skinners' payments to DECU on the Vehicles in mid-2008 and early 2009; 3) her involvement in the refinance of the Roadster with DECU; 4) the payment obligations to DECU under the refinance; and 5) the Skinners' option payments to Mr. Bowman.

[14] Mrs. Skinner corroborated Mr. Skinner's testimony, asserting that she made the payments in April, May and June 2008.

8

Period" on the receipt, he "just meant that [he] was going to pay the car off when [he] had the chance to do it." Tr. of Dec. 4, 2012 trial, 10:14-15. He had "every intention that [he] was going to pay that car off no matter what it took," and the stated punctuation at the end (i.e., the period) was to emphasize the fact that he was going to pay off DECU's lien on the Roadster. Tr. of Dec. 4, 2012 trial, 10:17-23, 50:5-9. Mr. Skinner claimed that, at the time he entered the deal with Mr. Huggins, he fully intended "to pay off the car with any means possible." Tr. of Dec. 4, 2012 trial, 50:8-12.

When he received the cash payment from Mr. Huggins, Mr. Skinner decided not to apply it to the debt owed on the Roadster because "there was not enough money to pay off the car at that point. There was a lot missing." Tr. of Dec. 4, 2012 trial, 11:7-8. He admitted that the cash payment would have paid down the debt if he had applied it to the debt, but he "didn't want to do that at the time. [He] had other plans." Tr. of Dec. 4, 2012 trial, 11:10-11.

Mr. Skinner disclosed that those "other plans" were to use funds he anticipated receiving from other sources. Specifically, Mr. Skinner testified that he intended to pay off DECU's lien with funds he expected to receive from his investments in various real estate development ventures. However, he did not receive any funds from these real estate development ventures; the real properties were foreclosed upon. Mr. Skinner alternatively testified that he intended to pay off DECU's lien with funds he expected to receive from a lawsuit in which he was involved.

Mr. Skinner further explained that he sold the lots to

9

Mr. Bowman "to secure money to keep making payments on the [Roadster]." Tr. of Dec. 4, 2012 trial, 20:15-16, 23:17-18, 57:6-7. He insisted that the transaction with Mr. Bowman was not a sale but a loan. Mr. Skinner testified that he never intended to

> really sell the lots. [H]e wanted to keep the lots. The deal [he] did with [Mr.] Bowman had an option payment in it to retain the lots until [he] further decided to do what [he] needed to do with them; [he] ultimately wanted to develop the lots not sell them.

Tr. of Dec. 4, 2012 trial, 22:23-25, 23:1-2; see also id. at 56:7-16.

Mr. Skinner asserted that he did not tell Mr. Huggins that he was going to use the cash payment to pay down the debt on the Roadster. He also had explained to Mr. Huggins that, although he might be able to use the lot sale proceeds to pay down DECU's lien on the Roadster, he was unsure as to when the lots were going to sell. Mr. Skinner further claimed that he informed Mr. Huggins that he was going to continue making payments on the Roadster until he received funds from his real estate ventures or from the lawsuit.

Mr. Skinner moreover asserted that he notified Mr. Huggins of his intent to refinance the Roadster. He also claimed that Mr. Huggins agreed to allow him to increase the amount of DECU's lien on the Roadster through the refinance.

Mr. Skinner further testified that he informed Mr. Huggins of the impending repossession of the Roadster.

Mr. Huggins confirmed that he knew about DECU's lien on the Roadster. He gave Mr. Skinner the cash payment "to go apply it towards what [Mr. Skinner] owed. And then when he got rid of the

10

property [i.e., lots], finish paying it off." Tr. of Dec. 4, 2012 trial, 107:1. He stressed that he believed Mr. Skinner "was making a payment on the car with all the money." Tr. of Dec. 4, 2012 trial, 107:6-7. Mr. Huggins acknowledged that he assumed that Mr. Skinner would "take the $12,000 cash payment to [DECU]." Tr. of Dec. 4, 2012 trial, 108:17-20.

Mr. Huggins averred that Mr. Skinner did not tell Mr. Huggins that he intended to use the cash payment and the lot sale proceeds for any other purpose than to pay down the debt owed on the Roadster. He asserted that he never agreed to allow Mr. Skinner to use the cash payment and/or the lot sale proceeds for any other purpose than to pay down the debt owed on the Roadster.

Mr. Huggins claimed that Mr. Skinner had promised that he "would pay the car off as soon as possible. And that's what we put on this receipt, that Shane would pay off the car, period." Tr. of Dec. 4, 2012 trial, 106:9-12 (emphasis added). He understood that the statement, "Shane Pay off Car Period," meant "Let's get it done." Tr. of Dec. 4, 2012 trial, 109:16. To Mr. Huggins, "it didn't matter how it happened, just pay it off, period." Tr. of Dec. 4, 2012 trial, 118:24-25. He did not mind that it would take Mr. Skinner some time to pay off DECU's lien on the Roadster "[a]s long as it didn't take 20 years." Tr. of Dec. 4, 2012 trial, 119:1-3. He also did not worry about the monthly payments Mr. Skinner had to make on the Roadster – "That was up to [Mr. Skinner], however he did that. [Mr. Huggins had] no business with that part of it. As long as [Mr. Skinner] was taking care of [DECU], [Mr. Huggins] didn't care what

11

[Mr. Skinner did." Tr. of Dec. 4, 2012 trial, 121:21-24.

Mr. Huggins knew that it would take Mr. Skinner some time to have title to the Roadster pass to him. Nonetheless, he "assumed [Mr. Skinner] was going to take this money, apply it towards the car. And then, however long it took to get the property, whenever [Mr. Skinner] sold it, we'd pay off the car." Tr. of Dec. 4, 2012 trial, 109:18-20. Mr. Huggins firmly believed that when Mr. Skinner sold the lots, he would use the lot sale proceeds to pay off the debt owed on the Roadster.

Mr. Huggins maintained that he had no knowledge of the refinance of the Roadster and that Mr. Skinner did not notify him of the refinance. In fact, he did not become aware of the refinance until DECU filed suit against him. Mr. Huggins insisted that he did not consent to allowing Mr. Skinner to increase the debt secured by the Roadster.

Mr. Huggins believed that Mr. Skinner had been making payments on the Roadster during the time he had possession of it. He was unaware that Mr. Skinner had defaulted on payments to DECU.

Mr. Huggins further asserted that he was unaware that Mr. Skinner was struggling to make payments on the Roadster at the time the deal was made. He admitted that he knew that Mr. Skinner expected to receive funds from a lawsuit. He also knew that if Mr. Skinner did not sell the lots, he would use the funds from the lawsuit to pay off or pay down DECU's lien on the Roadster.

Mr. Huggins testified that he did not know whether Mr. Skinner never intended to pay off DECU's lien on the

12

Roadster. He simply "trusted [Mr. Skinner] to pay the thing off." Tr. of Dec. 4, 2012 trial, 123:11.

During trial, the bankruptcy court explained to counsel for the Skinners and the Huggins that the focus of its inquiry was on whether Mr. Skinner intended to defraud Mr. Huggins at the time they entered the deal. Specifically, the bankruptcy court said:

> We've got to do fraud as of the moment that it occurred. Did [Mr. Skinner intend] to commit fraud by selling this [Roadster] to your client, and with no intention of paying off, basically, the lien, is what it boils down to.

Tr. of Dec. 4, 2012 trial, 27:10-13. See also Tr. of Dec. 4, 2012 trial, 103:15-17. It went on to explain that

> You have to determine intent by all the other factors that surround the whole deal. And here, we're only dealing with a period of time that's within a couple of months of the transaction.

Tr. of Dec. 4, 2012 trial, 104:5-8.

After hearing testimony from both Mr. Huggins and Mr. Skinner, the bankruptcy court informed counsel for the Skinners that "[Mr. Huggins had] a 51 percent preponderance of the evidence burden. Right now, he's meeting it." Tr. of Dec. 4, 2012 trial, 120:6-8. It pointed out that Mr. Huggins "[had been] pretty clear that the deal was that [Mr. Skinner] would try to pay off that lien as soon as one of two things happen[ed]. [Mr. Skinner] got the 12 grand and got the lot[s] sold. [Mr. Skinner] sold them within a month." Tr. of Dec. 4, 2012 trial, 120:10-13.

On the second day of trial, the bankruptcy court again noted that "you look at the totality of circumstances, really, and that's what [it was] trying to do." Tr. of Dec. 11, 2012 trial,

13

13:20-21.

Having reviewed the evidence and heard the testimony, the bankruptcy court revealed its view of the matter:

> [T]his is a classic case of a guy being strung out, so strung out that he's getting money from every source he possibly can and he's delusional. And [Mr. Skinner] is kidding himself that he's going to 'pay off the lien period' because [Mr. Huggins] obviously wanted the car – or [Mr. Huggins] wanted it free and clear – and gave [Mr. Skinner] basically $32,000 worth of consideration and [Mr. Skinner] did nothing with the dough.

Tr. of Dec. 11, 2012 trial, 19:8-15.

It analogized the instant matter to "the old credit card cases, when Joe Blow would go out and run up his credit card." Tr. of Dec. 11, 2012 trial, 19:19-20. The bankruptcy court went on to say

> Joe Blow would always say, "Gosh, I intended to pay that off the next time the bill came around," but they would run up, you know, thousands of dollars in luxury goods. And at the time they were doing it, their financial condition was so bad that there was just no [rational] way they could ever make that promise.
> . . . .
> So I think that's where [Mr. Skinner] is. He may have convinced himself that he didn't intend to do [Mr. Huggins] wrong. But in the eyes of the law, I think he probably – we could find inferentially that he did – that intention was not justified.

Tr. of Dec. 11, 2012 trial, 20:1, 20:3-7.

On December 14, 2012, the bankruptcy court issued its memorandum decision. It concluded that all of the necessary elements of § 523(a)(2)(A) had been proven.

The bankruptcy court found that when Mr. Skinner received the cash payment from Mr. Huggins and when Mr. Skinner sold the lots to Mr. Bowman, Mr. Skinner did not use any portion of the cash payment or the lot sale proceeds to pay off or pay down

14

DECU's lien on the Roadster. The bankruptcy court also found that the Skinners used the cash payment and the lot sale proceeds "toward other obligations which they had, or on living expenses." It further determined that, instead of paying off or paying down DECU's lien on the Roadster, the Skinners "made matters worse . . . by increasing the lien against the [Roadster]." It pointed out that the Skinners "quickly defaulted" on their payments to DECU.

The bankruptcy court found that the Skinners "at all relevant times, were living beyond their means, seeking cash from any source, and essentially 'robbing Peter to pay Paul.'" It determined that the Skinners were insolvent on the day Mr. Skinner entered into the deal with Mr. Huggins and that Mr. Skinner knew that he and Mrs. Skinner were insolvent.

The bankruptcy court determined that Mr. Skinner

> made a representation that was [so] far beyond his financial reality as to be deceptive, and that, when made, he knew that he either could not or would not perform his promise to quickly pay off the underlying DECU lien on the [Roadster].

It also found that the Skinners'

> financial circumstances were so out of control at the time of the [deal], that Mr. Skinner knew he would not use either the $12,000 [cash payment] or the [lot sale proceeds] received one month later, to deliver, to [the Huggins], a free and clear title, and pay off the DECU lien. This intent was borne out by all of the subsequent conduct of the [Skinners], who used those monies for other purposes, and who never made even the slightest attempt to pay off the lien on the [Roadster]. This wrongful intent was also emphasized by the [Skinners] increasing, by double, the lien on the [Roadster] which they had promised to pay off. (Emphasis in original.)

15

On April 26, 2013, the bankruptcy court entered a judgment[15] consistent with its memorandum decision.[16]  The Skinners timely appealed.[17]

## JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(I).  We have jurisdiction under 28 U.S.C. § 158.

---

[15] The bankruptcy court awarded the Huggins damages in the amount of $33,500 plus interest of 10% per annum.

[16] The bankruptcy court entered the judgment months after the trial apparently because it wished to determine the amount of attorney's fees and costs to be awarded to the Huggins as the prevailing parties.  It held a hearing on April 17, 2013 on the Huggins' application for attorney's fees and costs.  The bankruptcy court awarded a total of $22,173.70 in attorney's fees and costs.  It included this amount in the judgment.

[17] On December 12, 2012, the Skinners filed a motion for a new trial under Rule 9023 ("First Rule 9023 Motion")(adv. proc. docket no. 30).  On December 19, 2012, they filed a renewed motion for a new trial under Rule 9023 ("Second Rule 9023 Motion")(adv. proc. docket no. 37).  On May 2, 2013, they filed another motion for a new trial under Rule 9023 ("Third Rule 9023 Motion")(adv. proc. docket no. 56).
The bankruptcy court apparently did not set a hearing on the First Rule 9023 Motion or the Second Rule 9023 Motion.  It set a hearing on the Third Rule 9023 Motion for June 13, 2013.  Following the hearing, the bankruptcy court entered an order denying the Skinners' Third Rule 9023 Motion (adv. proc. docket no. 62) on September 11, 2013.  The Skinners do not argue that the bankruptcy court erred in deciding the Third Rule 9013 Motion in this appeal.

16

## ISSUE[18]

In excepting the Skinners' debt to the Huggins from discharge under § 523(a)(2)(A), did the bankruptcy court err in determining that the Skinners intended to deceive the Huggins?

## STANDARDS OF REVIEW

"Whether a claim is dischargeable presents mixed issues of law and fact, which we review de novo." Peklar v. Ikerd (In re Peklar), 260 F.3d 1035, 1037 (9th Cir. 2001). We therefore review the bankruptcy court's decision independently, giving no deference to its determinations. First Avenue West Building, LLC v. James (In re Onecast Media, Inc.), 439 F.3d 558,

---

[18] The Skinners state two issues on appeal: 1) did the bankruptcy court apply the incorrect legal standard in determining that their debt to the Huggins was excepted from discharge under § 523(a)(2)(A); and 2) did the bankruptcy court err in finding that all of the elements of fraud under § 523(a)(2)(A) had been met?

As the Huggins point out in their brief, the Skinners do not argue that the bankruptcy court applied the wrong legal standard, i.e., the five-part test set forth in Turtle Rock Meadows Homeowners Ass'n v. Slyman (In re Slyman), 234 F.3d 1081, 1085 (9th Cir. 2000). Under Slyman, a debt is excepted from discharge under § 523(a)(2)(A) if the creditor can establish the following five elements by a preponderance of the evidence: 1) the debtor made a misrepresentation and/or fraudulent omission or acted deceptively; 2) the debtor knew of the falsity or deceptiveness of his statement or conduct; 3) the debtor had the intent to deceive; 4) the creditor justifiably relied on the debtor's statement or conduct; and 5) the creditor sustained damages that were proximately caused by its reliance on the debtor's statement or conduct. Id. at 1087. (In their opening brief, the Skinners even cite Slyman for this same proposition.)

Instead, as the Huggins note, the Skinners actually challenge the bankruptcy court's finding under the third element: that Mr. Skinner intended to deceive Mr. Huggins at the time of the deal.

17

561 (9th Cir. 2006).

"A finding of whether a requisite element of a [§] 523(a)(2)(A) claim is present is a factual determination reviewed for clear error." Anastas v. Am. Sav. Bank (In re Anastas), 94 F.3d 1280, 1283 (9th Cir. 1996)(citation omitted). A bankruptcy court's factual finding is clearly erroneous if it is illogical, implausible or without support in inferences that may be drawn from the record. U.S. v. Hinkson, 585 F.3d 1247, 1262 (9th Cir. 2009)(en banc). See also Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 574 (1985)("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."). We must accept a bankruptcy court's factual findings unless we have a definite and firm conviction that a mistake has been committed. Decker v. Tramiel (In re JTS Corp.), 617 F.3d 1102, 1109 (9th Cir. 2010)(quoting Leichty v. Neary (In re Strand), 375 F.3d 854, 857 (9th Cir. 2004)).

### DISCUSSION

Under § 523(a)(2)(A), a bankruptcy court may except from discharge any debt for money, property, services or credit obtained by false pretenses, a false representation or actual fraud. To prevail on a claim under § 523(a)(2)(A), a creditor must establish by a preponderance of the evidence, each of the following five elements: 1) misrepresentation, fraudulent omission or deceptive conduct by the debtor; 2) knowledge of the falsity or deceptiveness of the debtor's statement or conduct; 3) an intent to deceive; 4) justifiable reliance by the creditor on the debtor's statement or conduct; and 5) damage to the creditor

18

proximately caused by its reliance on the debtor's statement or conduct. In re Slyman, 234 F.3d at 1085; Grogan v. Garner, 498 U.S. 279, 287 (1991).

The Skinners contend on appeal that the Huggins have failed to show that they intended to deceive the Huggins when the Skinners represented to the Huggins that they would pay off DECU's lien on the Roadster.[19]

As the bankruptcy court noted, a debtor seldom admits that he intended to defraud a creditor. Because "[he] is unlikely to testify directly that his intent was fraudulent, [the bankruptcy court] may deduce fraudulent intent from all the facts and

---

[19] We note that in its findings, the bankruptcy court determined that Mr. Skinner "made a representation that was far beyond his financial reality as to be deceptive, and that, when made, he knew that he either could not or would not perform his promise to quickly pay off the underlying DECU lien on the [Roadster]." Absent is any finding as to any specific representation made by Mrs. Skinner to the Huggins. However, the Skinners conceded early on that, "It is undisputed that the Skinners represented to the Huggins that they would pay off the lien on the [Roadster] . . . ." The Skinners did not argue to the bankruptcy court or in their briefs in this appeal that even if a § 523(a)(2)(A) claim was established as to Mr. Skinner, the elements of § 523(a)(2)(A) could not be met as to Mrs. Skinner. Accordingly, such argument is waived, and we do not consider it. "Ordinarily, if an issue is not raised before the trial court, it will not be considered on appeal and will be deemed waived." Levesque v. Shapiro (In re Levesque), 473 B.R. 331, 336 (9th Cir. BAP 2012); Beverly Cmty. Hosp. Ass'n v. Belshe, 132 F.3d 1259, 1267 (9th Cir. 1997) ("[B]efore an appellate court will consider . . . an issue, ordinarily the argument must have been raised sufficiently for the trial court to rule on it."). "We review only issues which are argued specifically and distinctly in a party's opening brief." Greenwood v. F.A.A., 28 F.3d 971, 977 (9th Cir. 1994)(citing Miller v. Fairchild Indus., Inc., 797 F.2d 727, 738 (9th Cir. 1986)).

19

circumstances of a case." Devers v. Bank of Sheridan, Montana (In re Devers), 759 F.2d 751, 754 (9th Cir. 1985). "Fraudulent intent may be established by circumstantial evidence, or by inferences drawn from a course of conduct." Id. at 753-54.

The bankruptcy court may find fraudulent intent where there has been a pattern of falsity or from a debtor's reckless indifference to or disregard for the truth of a representation. Khalil v. Developers Sur. & Indem. Co. (In re Khalil), 379 B.R. 163, 174 (9th Cir. BAP 2007)(discussing intent to deceive within the context of § 727(a)). See also Rubin v. West (In re Rubin), 875 F.2d 755, 759 (9th Cir. 1989)("[O]pinions as to future events which the declarant does not, in fact, hold or declarations made with reckless indifference for the truth may be found to be fraudulent.")(quoting Chase Manhattan Bank v. Fordyce (In re Fordyce), 56 B.R. 102, 105 (Bankr. M.D. Fla. 1985)). Within the Ninth Circuit, the phrase "reckless indifference to his actual circumstances" is used interchangeably with the phrase "reckless disregard for the truth of a representation." Advanta Nat'l Bank v. Kong (In re Kong), 239 B.R. 815, 826 (9th Cir. 1999)(citations omitted).

Recklessness alone does not equate to fraudulent intent; it provides evidence for consideration only. See Khalil, 379 B.R. at 174. Reckless conduct must involve more than simple or inexcusable negligence. Kong, 239 B.R. at 826. "The essential point is that there must be something about the adduced facts and circumstances which suggest that the debtor intended to defraud creditors of the estate." Khalil, 379 B.R. at 175 (quoting Garcia v. Coombs (In re Coombs), 193 B.R. 557, 565-66 (Bankr.

20

S.D. Cal. 1996)(internal quotation marks omitted)). That is, "the focus must be on 'the totality of the circumstances and whether they create the overall impression of a deceitful debtor.'" Nwas Oklahoma, Inc. v. Kraemer (In re Kraemer), 2011 WL 3300360 at * 6 (9th Cir. BAP 2011)(quoting Wolf v. McGuire (In re McGuire), 284 B.R. 481, 493 (Bankr. D. Colo. 2002)).

"A promise made with a positive intent not to perform or without a present intent to perform satisfies § 523(a)(2)(A)." Rubin, 875 F.2d at 759. Additionally, the promise can be found fraudulent "where the promisor knew or should have known of his prospective inability to perform." McCrary v. Barrack (In re Barrack), 217 B.R. 598, 606 (9th Cir. BAP 1998). "Allegations concerning [a debtor's] ability to pay are also relevant to the fraudulent promise analysis." Id. at 607 (citing In re Lee, 186 B.R. 695, 699 (9th Cir. BAP 1995)).

"'Deciding when misrepresentations cross the line from negligence to reckless disregard is an inherently subjective process.'" Kraemer, 2011 WL 3300360 at *6 (quoting McGuire, 284 B.R. at 493). "Even if we may have simply weighed the evidence differently as the trier of fact, we may not reverse the bankruptcy court's factual finding." Kraemer, 2011 WL 3300360 at *6 (citation omitted). See also Kong, 239 B.R. at 827 ("We emphasize that recklessness with respect to intent to repay, like fraudulent intent, involves a factual determination that is the province of the trial court.")(citation omitted).

The Skinners complain that the bankruptcy court improperly focused on their financial condition and inability to repay,

21

instead of their intent to repay the debt, as required under Ninth Circuit authority in Anastas.

Anastas involved a debtor who obtained cash advances from his various credit cards to finance his gambling. He always made the monthly minimum payment to one particular credit card issuer. But suddenly, the debtor was unable to do so, given all of the debts he owed to his other credit card issuers. Before he filed his chapter 7 bankruptcy petition, he tried to work out a repayment schedule with the subject credit card issuer, who refused. The credit card issuer then sought to except the credit card debt from discharge under § 523(a)(2)(A). The bankruptcy court found that the debtor committed fraud within the meaning of § 523(a)(2)(A) because he incurred the credit card debt without intending to repay it.

The Ninth Circuit remanded because the bankruptcy court erroneously based its determination on the debtor's inability to pay the credit card debt rather than on his intent to pay. The Ninth Circuit stressed that the bankruptcy court should inquire into whether the debtor "either intentionally or with recklessness as to its truth or falsity, made the representation that he intended to repay the debt" when determining whether to except a credit card debt from discharge under § 523(a)(2)(A). Anastas, 94 F.3d at 1286.

As we mentioned earlier, the bankruptcy court did compare Mr. Skinner's promise to pay off DECU's lien to that of a debtor's promise to pay off credit card debt in a credit card kiting scheme. Anastas is factually distinguishable from the instant appeal because the Skinners were not trying to obtain

22

credit extensions from the Huggins. They simply made a handshake deal with the Huggins to sell the Roadster and promised to pay off the DECU lien so that the Huggins would obtain clear title.

Moreover, contrary to the Skinners' assertions, the bankruptcy court did not err in considering their inability to pay DECU's lien as part of the totality of the relevant circumstances when determining that the Skinners had fraudulent intent. Their inability to pay DECU's lien was but one circumstance out of all of the evidence that the bankruptcy court could consider in determining whether the Skinners intended to deceive the Huggins. See Devers, 759 F.2d at 754; Barrack, 317 B.R. at 607.

More important, given their precarious financial condition at the time they made the Roadster deal, the Skinners demonstrated a reckless indifference to the truth. In the joint pre-trial statement, the Skinners admitted in their fact position that Mr. Skinner "[had] informed [Mr.] Huggins that he had no present ability to retire the lien on the '32 Ford Roadster as the lien was in excess of the $12,000 cash payment." They also admitted that their financial circumstances were "stressed."

Mr. Skinner admitted in his trial testimony that, at the time of the deal with Mr. Huggins, he was behind on child support and was late in making payments on the Vehicles and on his real estate obligations.

Also, the Skinners both repeatedly testified that they were having trouble making their payments to DECU, even before they sold the Roadster to the Huggins. Instead of using the cash payment and the lot sale proceeds to pay down DECU's lien, the

23

Skinners used these funds to pay for living expenses and other obligations. (The speed with which they sold the lots also highlights their difficult financial circumstances.) When they continued to struggle to make payments to DECU on all of the debts on the Vehicles, the Skinners increased DECU's lien on the Roadster by consolidating the debts for all of the Vehicles within three months of making the deal with the Huggins. Given their dire financial straits, the Skinners knew or should have known that they could not make good on their promise to pay off DECU's lien on the Roadster when they made that promise to the Huggins. (Although Mr. Skinner testified that he anticipated receiving funds from various real estate investments and from litigation, his expectations were speculative. And they later proved to be groundless.) As the bankruptcy court recognized, Mr. Skinner "made a representation [to pay off DECU's lien] that was [so] far beyond his financial reality as to be deceptive." Taken together, these circumstances support the bankruptcy court's finding of fraudulent intent. Even if we would have viewed these circumstances differently from the bankruptcy court, we cannot reverse its factual finding under the Ninth Circuit's "clearly erroneous" standard. See Kong, 239 B.R. at 827. The bankruptcy court did not clearly err in finding that the Skinners intended to deceive the Huggins within the meaning of § 523(a)(2)(A).

The Skinners also contend that the bankruptcy court ignored their attempts to pay off DECU's lien on the Roadster. Instead, they claim, the bankruptcy court fixated on Mr. Skinner's supposed promise to pay off DECU's lien quickly, which

24

Mr. Skinner did not make. The debtors assert that Mr. Skinner only agreed to pay off DECU's lien when he could, by whatever means necessary.

While Mr. Skinner never admitted that he promised to pay off the DECU lien on the Roadster "quickly," the bankruptcy court apparently accepted Mr. Huggins' testimony that Mr. Skinner represented that he would pay off the lien "as soon as possible." We agree that the Skinners did make a few subsequent payments on DECU's lien. Still, their limited payments are not dispositive in considering whether the Skinners deceived the Huggins. The conduct of the Skinners before and after they promised to pay off DECU's lien and their financial condition at the time they made their promise support the bankruptcy court's intent finding.

**CONCLUSION**

Although the Skinners were in financial difficulty, they promised the Huggins that they would pay off DECU's lien on the Roadster. In making that promise, the Skinners were recklessly indifferent to the truth of their ability to keep that promise. Circumstantial evidence supported the bankruptcy court's finding that the Skinners had the requisite intent to deceive the Huggins for purposes of § 523(a)(2)(A). The bankruptcy court therefore did not err in excepting from discharge the debt owed by the Skinners to the Huggins under § 523(a)(2)(A). We AFFIRM.

25